IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 8, 2011

## IN RE  ANTONIO C. F., JR.

**Appeal from the Chancery Court for Hamilton County**
**No. 10-A-006      W. Frank Brown, III, Chancellor**

---

**No. E2010-01787-COA-R3-PT - FILED - MAY 3, 2011**

---

The State of Tennessee, Department of Children's Services ("DCS") filed a petition seeking to terminate the parental rights of LaCondra DeShay B. ("Mother") to her minor child Antonio C. F., Jr. ("the Child") (d.o.b. 7-26-96).  Temporary custody of the Child was awarded to DCS on February 21, 2006, and the Child has been in foster care since that date. During this period of time, DCS made reasonable efforts by offering case management services to the paternal grandmother, Carrie F., who was the Child's custodian at the time of removal, but because she was incapable of managing his behavior, the Child was adjudicated dependent and neglected on April 27, 2006.  Following a bench trial on May 21, 2010, the court entered its order finding and holding, inter alia, that clear and convincing evidence existed to support the termination of Mother's parental rights based upon, (a) willfully failing to visit or making only token visitation with the Child for four months immediately preceding the filing of the petition to terminate; (b) abandonment of the Child by willfully failing to support or to make reasonable payments toward the support of the Child for four consecutive months immediately preceding the filing of the petition; and pursuant to Tenn. Code Ann. § 36-1-113(i) it is in the best interest of the Child that Mother's parental rights be terminated. Mother appeals, asserting that DCS failed to prove by clear and convincing evidence that termination of her parental rights was in the best interest of the Child.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Robert B. Pyle, Chattanooga, Tennessee, for the appellant, LaCondra DeShay B.

Robert E. Cooper, Jr., Attorney General & Reporter, and Alexander S. Rieger, Assistant Attorney General, General Civil Division, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Rachel M. Stephens, Hixson, Tennessee, Guardian ad Litem.

## OPINION

## I.  BACKGROUND

At the time of the bench trial on May 21, 2010, the Child, born in Hamilton County, was almost 14 years old and had been in the custody of DCS for over three and a half years. Mother was a non-factor for most of the Child's life after giving him to his paternal grandmother about seven or eight years before DCS became involved with the family.

Mother's testimony at trial addressed the visitation and child support issues:

Q.  . . .  [S]ince he's been in custody how often have you been visiting this child?

A.  His grandmother used to let me come over there and see him, and he'll come over where his other sisters were staying and go to birthday parties and all that.

* * *

Q.  When was the last time you saw him, you visited him?

A.  When he was staying with his grandmother.  I would say in '06.

Q.  So you have not seen this child since 2006?

A.  Yes.

Q.  All right, and that's a very long time, isn't it?

A.  Yes, it is.

* * *

Q.  . . .  [S]ince this child's been in the custody of the State of Tennessee, . . . how much money have you paid for his support?

A.  I give the grandmother, you know, money, whatever I could, but I never sent nothing to the –

Q.  And how much money have you paid for the State to take care of him?

A.  Nothing.

* * *

Q.  What money did you give to the grandmother while she had custody that wasn't through the system?

A.  Well if I had it, whatever she asked for.  Like on Christmas, I'd bring her stuff for Christmas.  I would do things like that.

Q.  Tell the Judge in terms of money, you know, would you buy a gift for $5.00 . . . and a gift for $100.00 . . . – he doesn't have any idea if you bought Christmas whether that's –

A.  Let's see, Christmas '06 right before he got taken into state custody, I spent like $150.00 altogether for all three of my children, and like because I have extra money, like if she needed $50.00 . . . , if I had it I'll give it to her.

Q.  How often did that happen?

A.  Not that often, because you know, I didn't really have the money like that.

Q.  And is it – did you give her money every time you had it?

A.  I tried to.

Q.  Okay.  But you don't know over the years when the last payment . . . was?

A.  The last payment was, and it was altogether was in '06 for Christmas.

Q.  Okay.  But since then you haven't paid any money?

A. No.

Regarding any special needs or problems had by the Child, Mother testified:

Q. Does [the Child] have any special needs or special problems?

A. No. Because every time he come over my house, or whenever I seen him, he was okay. Wasn't nothing wrong with him.

Q. Okay, this child doesn't have any emotional or behavioral problems that require any type of special attention?

A. Not around me, he never did.

* * *

In further testimony, Mother admitted that she had been in and out of jail since 2006; at the time of trial, she was incarcerated for contempt of court for failure to pay child support. She indicated that upon her release, she was going to the Endeavors Program. She noted that after the program concludes, it will take her a period of time to get a home, a job, and provide for herself and the Child.

Mother acknowledged that she attended only one hearing regarding the Child in 2006. She admitted that during times she has been released from jail, she never called or contacted the case manager to make arrangements to visit with the Child. She noted that she has given birth to a total of five children – the other four are in the custody of her mother.

Everett Martin Banks testified that he was the Child's foster parent from December 2009 until March 2010. He noted as follows regarding the Child's special problems and needs:

Q. . . . [Y]ou had a chance to observe this child and become familiar with his special needs and special problems?

A. Very much so.

Q. Tell the Court what type of special problems or needs this child has?

-4-

A.  Well, [the Child] – oh, it's a list.  Well, he came to my home with eight medications.  For example, Phenobarbital for a seizure disorder.  Klonopin . . . .

They gave him, his psychiatrist gave him a list of medications to keep him stable because he was under a lot of emotional distress.

He took medications for allergies, you know, like the Allegra and things of that nature.  He had nasal sprays.  He had to sleep with a C-PAP machine because he has . . . sleep apnea.

He did have a correction for his shoes . . . because his feet were growing abnormally to where we actually had a schedule before he was removed from my home, he actually had . . . schedule[d] surgery to correct his bunions with Doctor Dennis Vabaco (sic)[.]

And we did a consultation March 12th, and I had to call back for the surgery, but we never [did] . . . the surgery, he was removed from my home.

Q.  How significant or profound were this child's behavioral and emotional problems?

A.  Very, very profound.  He had a Special Assistant, who was named Angie Gentry at Central High School – well before he came to my home he went to the Dawn School, because he had severe learning disabilities.

But when he was placed in a foster home previous to mine, he was at – they moved him to Brown Middle School, but he had a personal assistant because he could not read at all.  Or he still can't.

He can recognize some words, but they had an educational plan set for him to where he can just get through school as a functional reader, so he can at least function in life.

But his cognitive skills and reading skills and just standard things that a 7th grader should have, his level was probably at kindergarten level, as far as learning disabilities.

Q.  And taking care of [the Child], how difficult a job is that?

A. Literally it was a full-time job. Any time [the Child] – and mostly it would be centered around food.

But any time there was a situation where [the Child] was told, no, he would go into a shutdown mode to where he would – no matter if it's in the middle of Market Street, he would sit out in the middle of the street and sit there and would not move for anything.

When the stress became too significant for him, he had violent outbursts. I was called to Brown Middle School, if I'm not mistaken six times, because he would leave school.

And the last time, which is what got him placed in a group home, was when he ran away from school, but he was violent before it happened, and they had to call a resource officer to get him calmed down. He ran away, and that's how he ended up getting to the group home.

Q. So in the spring of this year it was decided that he needed a higher level of care than a foster home could provide?

A. Correct. Because me and my wife were missing so much work, because we were getting calls literally three times a week. You need to come get [the Child], you need to get him settled down.

You need to talk to a psychiatrist to see if they can boost up his medicine. I mean, just so many – I mean, he attacked my wife all because he couldn't get an extra slice of cake, you know.

It was just so much to where one of us would have had to quit our jobs to care for him like he needed to be cared for . . . .

Mr. Banks further testified that he took the Child to see the paternal grandmother once a week but the visits did not go well. During the last visit, the Child lost control after losing at a Wii game and became really agitated and violent. At that point, the visits with the grandmother were stopped.

As to the positive aspects, Mr. Banks stated that the Child, who is big and loves to eat, is loving, affectionate, and responds to praise. He does better with younger children than older ones. Prior to his placement at the group home, the Child did well with the family

environment at the foster home. Mr. Banks opined that in the right educational environment with a stay at home parent and younger siblings, the Child could do well.

Brenda M. Jenkins, the auditor of medical records at the county correctional and detention facility, testified that at the time of trial Mother was an inmate at the facility on a contempt of court charge. She reported that Mother had previously been incarcerated there from June 16 to August 13, 2009, on theft and contempt of court charges.

Lisa Starkey, a team leader over foster care and post-custody at DCS, testified that the records revealed that Mother had no visitation with the Child within the year prior to the trial. She noted that the Child had been placed in a group home in an effort to stabilize or control his behavior and because he needed round the clock supervision. She believes he is an adoptable child, but he will need a home that provides a lot of supervision, is open to therapeutic assistance, and is willing to work hand-in-hand with the therapist to make sure that the Child's needs are met. Ms. Starkey indicated further that the prospective adoptive parents must play a strong role in the Child's schooling, be nurturing and loving, and be able to provide supervision. She opined that the Child will need care for the rest of his life. On an optimistic note, she testified that DCS successfully has placed children of similar age, circumstance, and problems in adoptive homes on prior occasions.

As to the matter of the termination of Mother's parental rights, Ms. Starkey observed that there is no less drastic alternative because the Child needs permanency and cannot continue to wait on his parents to get their lives in order. She noted that the Child has been in the custody of DCS since February 2006. She admitted that while DCS did not have a potential adoptive home available at that time for the Child, she was hopeful one would soon be found.

Regarding opportunities for Mother to visit with the Child, Ms. Starkey testified that she had advised the case manager to allow Mother to visit the Child if she presented herself for visitation. However, Mother never contacted DCS and the agency was unable to evaluate her ability to parent. DCS's only knowledge of Mother was that she did not visit or support the Child.

After presentation of the proof and arguments of counsel, the trial court made the following findings:

> The Court notes that not withstanding her knowledge . . . and . . . testimony that [DCS] wanted to terminate her parental rights and take away her child, . . . she did not call one time during the four months and one week or so that she was free from jail . . . .

Likewise, she paid no support at all during that period. Indeed she was sent back to jail on the 22nd of December 2009 for contempt of court for failure to pay child support.

\* \* \*

. . . The Court has not found in the statute or its case law a specific requirement that an adopt[ive] home be ready the minute an Order of Termination is filed, or when such an Order is final.

[Mother], in all candor, does not appear to have been a mother to this child, with the exception of the birth process, and perhaps shortly thereafter.

. . . [W]hen the child was taken into custody by [DCS], the actual physical custodian was the paternal grandmother.

[Mother] indicated that the paternal grandmother had had physical custody and raised the child some seven or eight years prior to DCS's taking the child in custody.

Even though [Mother] would go to the daddy's mother's house to visit with the child on the weekends or holidays, it is not the same thing as being a mother.

The Court also notes that the other four children that [Mother] had brought into this world are in the custody of her mother. . . .

Accordingly, the trial court ruled, inter alia, as follows:

3. Grounds for the termination of the parental rights of [Mother] to the child, . . . exist, in that:

(A) Respondent, [Mother], abandoned [the Child] by willfully failing to visit or making only token visitation with said child for four (4) months immediately preceding the filing of this petition, despite knowing that said child was in state custody and despite being free and able to make such visits. The mother appeared at one (1) court hearing in Hamilton County Juvenile Court in August 2006. The Court instructed the mother to contact the case manager. The mother has never contacted [DCS] to ask to be included in the permanency plan for the child, to work on reunification, or to seek visitation.

(B) [Mother] abandoned [the Child] by willfully failing to support said child or to make reasonable payments toward the support of said child for four (4) consecutive months immediately preceding the filing of this petition. [Mother] has not paid support for the subject child since he has been in the custody of the state.

4. Pursuant to T.C.A. § 36-1-113(i), it is for the best interest of the subject child and the public that all of the parental rights of respondent [Mother], to the child . . . be forever terminated and that the custody, control and complete guardianship of said child should now be awarded to the State of Tennessee, Department of Children's Services with the right to place said child for adoption and to consent to any adoption *in loco parentis*, in that,

(A) Defendant [Mother] failed to effect a lasting adjustment of her circumstances after the state has made reasonable efforts to help her for such duration of time that lasting adjustment does not reasonably appear possible. The Defendant [Mother] appeared at one court hearing in August 2006 and the Court at that time instructed the Defendant [Mother] to contact the case manager to set up an appointment. The Defendant [Mother] never contacted the case manager and has not returned to Court since.

(B) There is no meaningful relationship between the Defendant [Mother] and child. Defendant [Mother] has not visited with the child in well over one year and their relationship before that was not a close one, as the paternal grandmother had been given primary responsibility for raising and caring for the child.

(C) The Defendant [Mother] has not maintained regular visitation or other contact with the child. The subject child was removed from the grandmother's custody and the Defendant [Mother] has not had any involvement with the child since he has been in the custody of the State. The Defendant [Mother] has willfully abandoned the child despite knowing he was in custody.

(D) Respondent [Mother] has not paid child support consistent with child support guidelines.

* * *

The court order of July 21, 2010, ordered Mother's parental rights terminated on the basis of abandonment by failure to visit and failure to support. In addition, termination was found

to be in the best interest of the Child. Mother filed a timely notice of appeal.

## II. ISSUE

Mother raises one issue for this court's review. For clarity, we will restate and address this issue as follows:

> Whether the trial court properly found by clear and convincing evidence that it was in the best interest of the Child to terminate Mother's parental rights.

## III. STANDARD OF REVIEW

In the 2010 opinion of *In re Bernard T.*, the Tennessee Supreme Court provided guidance to this court in reviewing cases involving the termination of parental rights:

> A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under Tenn. R. App. P. 13(d). *See In re Adoption of A.M.H.*, 215 S.W.3d [793] at 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under Tenn. Code Ann. § 36-1-113, the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim. *State, Dep't of Children's Servs. v. Mims*, 285 S.W.3d [435] at 447-48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.,* 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004).
>
> Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d [240] at 246 [(Tenn. 2010)]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010).

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App. 1995) (rev'd on other grounds, *In re Swanson*, 2 S.W.3d 180 (Tenn. 1999)); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This

right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(l)(1)). "Few consequences of judicial action are so grave as the severance of natural family ties." *M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. Tenn. Code Ann. § 36-1-113 is a statute governing termination of parental rights in this state. A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interests of the child." Tenn. Code Ann. § 36-1-113(c); *In re F.R.R., III*, 193 S.W.3d at 530. Both of these elements must be established by clear and convincing evidence. *See* Tenn. Code Ann. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000) (abrogated on other grounds, *In re Aubrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005)).

The heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. M.S., Aug. 13, 2003), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

## IV. DISCUSSION

-11-

As noted above, a parent's rights may be terminated only upon a finding by clear and convincing evidence that the grounds for termination have been established and that termination is in the best interest of the child. Mother has not challenged the trial court's findings as to grounds for termination but disputes the conclusion of the court regarding the best interest of the Child. Accordingly, we must consider whether clear and convincing evidence supports the trial court's best interest determination.

We are guided by the non-exclusive list of factors provided in Tenn. Code Ann. § 36-1-113:

> (i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> > (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> >
> > (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> >
> > (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> >
> > (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> >
> > (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> >
> > (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
> >
> > (7) Whether the physical environment of the parent's or

-12-

guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to §36-5-101.

Tenn. Code Ann. §36-1-113(i) (2010).

As this court has noted, "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child, which interests are hereby recognized as constitutionally protected and, to that end, this part shall be liberally construed." Tenn. Code Ann. §36-1-101(d). *See White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

Mother argues that DCS failed to prove by clear and convincing evidence that termination is in the Child's best interest considering the only alternative was a group home placement. DCS counters that there was overwhelming evidence that termination of Mother's parental rights was in the Child's best interest pursuant to a number of the relevant statutory factors. According to DCS, even though the Child was not ready to be placed in a pre-adoptive home at the time of trial, this single factor is not dispositive when making a best interest analysis.

The trial court made certain findings as to best interest. We will consider these findings in light of the statutory factors:

*Factor One*: Whether the parent . . . has made such an adjustment of

-13-

circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent . . . .

*Trial Court Findings:* "[Mother] failed to effect a lasting adjustment of her circumstances after the state has made reasonable efforts to help her for such duration of time that lasting adjustment does not reasonably appear possible. [Mother] appeared at one court hearing in August 2006 and the Court at that time instructed [Mother] to contact the case manager to set up an appointment. [Mother] never contacted the case manager and has not returned to Court since."

Since Mother has failed to make any adjustment in her circumstances to care for this Child, the trial court properly weighed this factor heavily in favor of termination being in the best interest of the Child.

*Factor Two*: Whether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible . . . .

As noted on Factor One, since Mother has failed to make any adjustment in her circumstances to be able to care for this Child, the trial court properly weighed this factor heavily in favor of termination being in the best interest of the Child.

*Factor Three*: Whether the parent . . . has maintained regular visitation or other contact with the child . . . .

*Factor Four*: Whether a meaningful relationship has otherwise been established between the parent . . . and the child . . . .

*Trial Court Findings*: "There is no meaningful relationship between [Mother] and [the Child]. [Mother] has not visited with the child in well over one year and their relationship before that was not a close one, as the paternal grandmother had been given primary responsibility for raising and caring for the child."

Both Factors Three and Four were considered and addressed in the findings of the trial court. There is no meaningful relationship between Mother and the Child, Mother has no knowledge of the Child's present mental or physical conditions, and she has not visited or even attempted to visit with the Child while he has been in the custody of DCS. These two findings overwhelmingly support the trial court's determination that it is in the best interest

of the Child to terminate Mother's parental rights.

> *Factor Six*: Whether the parent . . . has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household . . . .
>
> *Trial Court Findings*: "[Mother] has not maintained regular visitation or other contact with the child. The subject child was removed from the grandmother's custody and [Mother] has not had any involvement with the child since he has been in the custody of the State. [Mother] has willfully abandoned the child despite knowing he was in custody."

The trial court also found that Mother has not paid child support for the Child. In recognizing Mother's neglect of the Child, the trial court properly weighed this factor in support of its determination that termination was in the best interest of the Child.

Pursuant to the heightened burden of proof in proceedings under Tenn. Code Ann. § 36-1-113, we further note that the evidence presented at trial reveals that the Child is in need of special care that is now being made available to him -- a change in environment would have a detrimental effect on his emotional, psychological, and medical condition. Tenn. Code Ann. § 36-1-113(i)(5). Additionally, Mother did not provide a home for the Child in the past and did not testify to having any current plans to obtain one; thus, it does not appear that the physical environment of her home will be safe and stable. *See* Tenn. Code Ann. § 36-1-113(i)(7).

Considering the statutory factors on best interest and the trial court's findings, we conclude that the termination ruling must stand. Given the weight of the evidence and the totality of the circumstances, the trial court properly found that termination of Mother's parental rights was in the best interest of the child.

## V. CONCLUSION

The judgment of the trial court is affirmed, and this cause is remanded for collection of the costs below. The costs on appeal are assessed against the appellant, LaCondra DeShay B.

_____
JOHN W. McCLARTY, JUDGE